## A02A0775. TODD v. CASCIANO.
(569 SE2d 566)

POPE, Presiding Judge.

We granted Joan Todd's application to appeal an order of the Juvenile Court of Gwinnett County changing physical custody of the parties' five children to the natural father.[1]

After ten years of marriage, Todd (age forty-two at the time of the hearing) and Peter Casciano (age thirty-nine at the time of the

---

[1] We first note that Todd has not given proper citations to the record. We remind the bar that citations must be made to the page numbers of the record itself – "the volume or part of the record or transcript and the page numbers that appear on the appellate records or transcript as sent from the court below." Court of Appeals Rule 27 (a) (1). Use of lengthy titles supplied by court reporters to volumes of the record is not helpful.

hearing) were divorced on June 14, 1995, shortly after their fifth child was born, and the divorce decree awarded the parents joint custody of their children. The parties agreed that Todd would have primary physical custody. Based on a court order dated January 2000, the children resided with Todd nine days out of every fourteen-day period and with Casciano for the rest. On August 24, 2000, Casciano filed a petition to change custody and sought an order of contempt. In Count 1, he claimed that circumstances had changed that had adversely affected the children in that Todd "[was] living in a meretricious relationship in an open manner with a member of the opposite sex in the presence of the minor children." In Count 2, he alleged that Todd should be held in contempt for violating a provision of the divorce decree, which provided that "[n]either party shall cohabitate [sic] with a person of the opposite sex, not a relative, in the presence of the children."

After hearing the evidence, the juvenile court ordered that the parties retain joint legal custody, but provided that the father have primary physical custody and that the mother have fairly typical visitation rights. The court based its decision on three reasons concerning Todd: "(1) [that she was] continually cohabiting with boyfriends with the children; (2) [that she provided a] chaotic and unstable home environment that is psychologically and morally damaging to the children; and (3) [because of] her behavior toward the children, including hitting them, driving them home at 4-5 A.M." The court ordered Todd to make child support payments to Casciano and awarded him $6,000 of attorney fees. At the time of trial, the children were approximately twelve, eleven, nine, eight, and six years old; the two oldest and two youngest are girls.

1. In five separate enumerations of error, Todd contends that the evidence was insufficient to support each of the juvenile court's three findings, that it applied an erroneous definition of cohabitation in making its decision, and that there was no showing of harm to the children. Therefore, she concludes, it abused its discretion in changing primary physical custody.

A trial court is authorized to modify an original custody award upon a showing of "new and material changes in the conditions and circumstances substantially affecting the interest and welfare of the child." (Citations, punctuation and emphasis omitted.) *Evans v. Stowe*, 181 Ga. App. 489, 491 (4) (352 SE2d 811) (1987). See also OCGA § 19-9-1 (b); *Lightfoot v. Lightfoot*, 210 Ga. App. 400, 403 (3) (436 SE2d 700) (1993). The proof must show both a change in conditions and an adverse effect on the child or children. See, e.g., *Saxon v. Saxon*, 207 Ga. App. 471-472 (428 SE2d 376) (1993); *Livesay v. Hilley*, 190 Ga. App. 655, 656-657 (2) (379 SE2d 557) (1989). "The duty of the court in all such cases shall be to exercise its discretion to look to

and determine solely what is for the best interest of the child or children and what will best promote their welfare and happiness. . . ." OCGA § 19-9-3 (a) (2). On appeal of such a case, this Court will affirm the trial court's decision if there is any reasonable evidence to support it. *Hayes v. Hayes*, 199 Ga. App. 132, 133 (404 SE2d 276) (1991).

Evidence was presented at trial that showed that in the year 1999, Todd met William Roger Hall over the Internet, and in February 2000, they began a relationship, including a sexual relationship, that lasted for about nine months. During the summer of 2000, after school was out, Todd drove fifty to seventy-five miles from her home in Snellville to Dallas, Georgia, on as many as five or six occasions, with all the children, to stay with Hall at his house for one to three days at a time. She would sometimes leave Hall's house very early to return to her home in Snellville, apparently to open the day care that she ran in her home. For example, according to a private investigator, they left at 4:50 a.m. on one occasion and 4:44 a.m. on another. Todd admitted that this required getting the children up at 4:00 or 4:30 a.m.

Todd also admitted spending the night there at least two dozen times herself, presumably at times when the children were with Casciano, but denied sleeping with Hall when the children were there. She insisted that she took the children with her because she wanted Hall to get to know her children better, and because the entire group would plan activities that made it more convenient to stay at Hall's house. She also denied that Hall ever spent the night at her house in Snellville.

The relationship lasted from about March to December, but there is no evidence that the children went to Hall's house after August. Indeed, Casciano admitted that since August 2000, when he filed the action for a change of custody and contempt, Todd ceased taking the children to Hall's house.

The evidence at trial raised some concern about Todd's credibility, primarily because she stated in response to discovery questions that the children stayed overnight at Hall's house only once. Then at trial she testified that it happened twice. Yet other evidence showed more visits. Also, one of the children said that she had been in the bed with Todd and Hall on one occasion when she awoke during the night and walked into their room, apparently because she had become scared. That testimony contradicted Todd's assertion that she did not sleep with Hall while the children were there.[2]

---

[2] Other statements made by counsel indicate that there was no suggestion of improper behavior toward the child; the testimony was elicited to contradict Todd's testimony that she did not sleep with Hall while the children were at Hall's house.

A parental fitness evaluation was performed on Todd by Dr. Elizabeth Ellis, Ph.D., clinical psychology. After meeting with Todd, giving Todd certain psychological tests, interviewing only one of the children, interviewing four other witnesses, and reviewing various documents, she found:

> Ms. Todd does appear to have a history of showing poor judgment regarding her dating of men and involving her children in these relationships. She appears to have involved herself with a much younger man without giving thought to whether he would be suitable as a stepfather to 5 children, only to find that he was not up to this task. . . . Given these involvements and her strong interest in meeting men on the internet, her pursuit of a love interest is an over-riding interest at this time. She does not appear to have a clear sense of how to keep these relationships separate from her children and to make suitable selections of partners. She appears to make these decisions on impulse and rationalize them later.

She also concluded, "[Todd] appears to make decisions about her personal life and the children's lives in a haphazard manner, sort of going with what suits her at the moment, without much deep thought as to the implications of her decisions. She appears to gloss over possible negative effects of her behavior on her children."

Dr. Ellis noted, however, that due to the limited nature of what the court ordered her to do, she could not determine whether the Todd home was a chaotic and unsupervised environment, and she did not have enough information to determine whether Todd's cohabitation with Hall had a detrimental effect on the children. She stated, "Further interviews with the children and teachers would broaden our information about the possible impact of Ms. Todd's behavior on the children, as well as yield information as to their attachment to her and to their father."

Casciano testified that in his opinion Todd's behavior was very destructive morally for the children. He testified that the message that Todd was giving them was inconsistent with what they were getting when they went to church. He explained that "their morals get watered down," and he was especially concerned about the message it gave his oldest daughter. He said the children "are put in potential harm if we don't know a person and we bring them overnight." He also testified that getting up so early to drive back was detrimental because one time two of the children had soccer games that day, and such exertion in the heat was not good without plenty of rest. In general, he said he was worried for his children's safety in connection

with his perception that Todd got involved with men she did not know well and exposed the children to the men. He also testified that there have been several occasions when Todd did not make sure that an adult was present to supervise the older children when they got out of school, including one incident when Todd dropped the oldest child off at a restaurant with some of her friends for thirty minutes, but without a parent present.

He admitted that his children were all happy, healthy, intelligent, and well adapted, but he added that they were starting to have behavioral problems in school. He introduced documents written by his 12-year-old daughter and published on her website that appeared to be a personal advertisement, which in his opinion reflected the bad influence of Todd. Indeed, it was similar to biographical information that Todd maintained on the Internet. He introduced evidence that one of his children's grades had recently changed markedly for the worse in one subject. It also reflected that the child's behavior had changed from satisfactory to needing improvement.

Todd admitted that one child's grades in math and science had fallen off in the fall of 2000, and that the child's teacher commented that the child was having difficulty focusing on classwork and homework. Another child was doing very well academically but having some recent behavioral problems and difficulty in one subject. Dr. Ellis reported that one of the children said she "didn't like sharing her mother with her boyfriends and felt it was better if her mother did not have boyfriends." There was some testimony that the children wanted custody to remain as it was.

Casciano also testified that only one month or so before the hearing, one of his children testified that she got a cut on her eyelid when Todd missed while trying to hit her sibling and hit her in the eye instead.

There was evidence that Casciano is a fit person to have custody of the children and that he is able to provide a satisfactory home life for them. The evidence showed that he had stable employment, that his second wife had flexible hours and therefore could oversee the children, that he had an adequate home for raising the children, that he was involved in the children's activities, and that he attended church regularly. Although some questions were raised about Casciano's personal behavior earlier in life and about his system of discipline, there was evidence to support the conclusion that he was fit to have custody.

The above evidence supports the trial court's findings and the conclusion that there were "new and material changes in the conditions and circumstances substantially affecting the interest and welfare of the child[ren]." (Citations, punctuation and emphasis omitted.) *Evans v. Stowe*, 181 Ga. App. at 491 (4). As stated by the

Supreme Court, "Because of [this Court's] inability to decide who should have custody of children, we apply the rule announced in . . . *Robinson v. Ashmore*, 232 Ga. 498, 500 (207 SE2d 484) (1974): If there is 'reasonable evidence' in the record to support the decision of the trial judge, that decision will be affirmed on appeal." *Hawkins v. Hawkins*, 240 Ga. 30 (239 SE2d 358) (1977). And,

> [t]he "reasonable evidence" rule applicable in change of child custody cases is applicable even where the divorced custodial parent is charged with having sexual relations. If the trial judge finds from the evidence that the welfare of children is affected and changes their custody, that decision will be affirmed on appeal where there is reasonable evidence to support it.

*Id.* at 31. This rule has been followed in several cases where the only or primary allegation of a change of conditions was that the custodial parent was engaged in a sexual relationship to which the child was exposed.[3]

In this case, the juvenile court was authorized to conclude that there was a material change in circumstances arising out of Todd's decision to take the children to her boyfriend's house for several weekends and spend the night, where the evidence suggests that Todd and Hall slept together on those occasions. Although Dr. Ellis, because she needed more data, did not reach the conclusion that Todd's behavior had affected the children, the juvenile court could make that conclusion based on all the evidence before it. Casciano's concern about the children's morality, the evidence that two of the children had begun to have academic and behavioral problems, and the oldest child's suggestive Internet message provide reasonable

---

[3] See, e.g., *Burger v. Krueger*, 224 Ga. App. 179 (480 SE2d 230) (1996) (change of custody affirmed where custodial parent slept with married woman in home with child and later lived with the same woman outside of marriage); *Dixon v. Dixon*, 183 Ga. App. 756 (360 SE2d 8) (1987) (change of custody affirmed where only evidence of a change in circumstances was conflicting testimony that the custodial parent had been living with a man to whom she was not married), disapproved on other grounds, *Wilson v. Baldwin*, 239 Ga. App. 327, 328 (519 SE2d 251) (1999); *Gibson v. Pierce*, 176 Ga. App. 287 (335 SE2d 658) (1985) (change of custody affirmed where custodial parent admitted sleeping with her fiancé prior to the marriage while the child was present in the home); *Bell v. Bell*, 154 Ga. App. 290 (267 SE2d 894) (1980) (change of custody affirmed where only change of condition was that custodial parent was living with a man outside of marriage); *Godfrey v. Godfrey*, 239 Ga. 707 (238 SE2d 378) (1977) (change of custody affirmed where custodial parent had been living with a man outside of marriage and the relationship had interfered with other parent's visitation rights). Compare *Hayes v. Hayes*, 199 Ga. App. 132 (denial of change of custody affirmed where both parents were involved in meretricious relationships in the presence of the child).

support for the trial court's decision. Therefore, we cannot find an abuse of discretion.[4]

*Saxon v. Saxon*, 207 Ga. App. 471, and *Livesay v. Hilley*, 190 Ga. App. 655, relied upon by Todd, are distinguishable. In *Saxon*, the trial court specifically found that the mother was an unfit parent because she was involved in a "meretricious" relationship, i.e., dwelling together continuously and openly in an unmarried relationship; but the facts only showed that she was dating a man with whom she had a sexual relationship. *Saxon*, 207 Ga. App. at 471. Accordingly, the court's finding was clearly erroneous. In addition, in *Saxon*, unlike here, there was no evidence that the relationship in question resulted in harm to the child. Id. Similarly, in *Livesay*, there was no evidence that the brief period of cohabitation by the custodial parent had any adverse effect on the child. *Livesay*, 190 Ga. App. at 656-657 (2).

2. Furthermore, we find no merit in Todd's argument that the court was clearly erroneous in connection with the change in custody when it found that she was "cohabiting" with her boyfriend. She contends that cohabiting can only mean living together as spouses and that all she did was stay over on several occasions. Compare *Saxon*, 207 Ga. App. 471 (similar argument involving the definition of meretricious). But, cohabiting can also mean to "share the same place." Webster's New World Dictionary (3rd college ed. 1988), p. 271. The juvenile court was authorized to find a change in conditions based on the several overnight visits to Hall's house and was not required to find that Todd and Hall had effectively moved in together in order to do so.

3. With regard to the award of attorney fees, however, the use of the term "cohabiting" requires closer scrutiny.

We first note that the attorney fee award can only be interpreted as being based on a finding of contempt. OCGA § 19-6-2 specifically authorizes an award of attorney fees in actions for contempt of court involving child custody. OCGA § 19-6-2 (a). See *Thedieck v. Thedieck*, 220 Ga. App. 764, 767 (2) (470 SE2d 265) (1996) (regarding history of statute). Although the juvenile court's order does not indicate whether the award was made in connection with the claim for contempt or the request for a modification of custody, the complaint indicates that Casciano sought attorney fees solely in connection with the count for contempt. Accordingly, we read the trial court's order as an award for contempt.

The contempt award is based on an apparent finding that Todd violated the terms of the divorce agreement in that she "cohabitate[d]

---

[4] This resolves Todd's first, fourth, fifth, and sixth enumerations of error.

[sic] with a person of the opposite sex, not a relative, in the presence of the children." The word "cohabit" has more than one meaning. See Webster's New World Dictionary, p. 271. Todd testified that she understood the word cohabit, as used in the divorce agreement, to mean actually move in with someone, rather than just spend a weekend or two with someone. This appears to be the more common meaning. For example, Black's Law Dictionary defines "cohabitation" as follows: "To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations."

> Before a person may be held in contempt for violating a court order, the order should inform him in definite terms as to the duties thereby imposed upon him, and the command must therefore be express rather than implied. . . . Indefiniteness and uncertainty in a judgment, decree, or order may constitute a good defense in proceedings for contempt based on the violation of such judgment, decree, or order.

(Citation and punctuation omitted.) *Hughes v. Browne*, 217 Ga. App. 567, 568 (459 SE2d 170) (1995). Although the court may have used a less common definition of "cohabit" in describing grounds for a change in custody, in ruling on the count for contempt, the court was required to construe the divorce agreement in order to determine the manifest intent of the parties in using that term in the agreement. See *Brown v. Farkas*, 195 Ga. 653 (2) (25 SE2d 411) (1943). "The trial court often must construe the [divorce] agreement and decree in order to determine the contempt issue before it. [Cit.]" *Nolan v. Moore*, 241 Ga. 156 (244 SE2d 10) (1978). Because the basis for the trial court's contempt order is uncertain and because there is no indication that the court followed the rules of construction with regard to the word "cohabit," we must reverse and remand the attorney fee award for further action consistent with this opinion. The trial court must construe the agreement first and then determine whether Todd violated it.

4. Todd contends the trial court improperly considered her conduct prior to the most recent court order regarding custody of the children. But, a trial judge is presumed to have considered only legally admissible evidence. See *Schaffer v. City of Marietta*, 220 Ga. App. 382, 384 (2) (469 SE2d 479) (1996). Further, the court itself noted that any evidence it received about events occurring before January 2000 would not be relevant to any alleged change in conditions except to show the status quo at that time. Therefore, without some showing that the trial court considered Todd's conduct prior to 2000, we must presume it did not.

5. Todd also contends that the juvenile court failed to consider the desires of the two children who were between eleven and fourteen years old, in accordance with OCGA § 19-9-1 (a) (3) (B). That Code section provides that "the court shall consider the desires, if any, and educational needs of the child in determining which parent shall have custody." Id. But it also provides that desires of children that age are not controlling. Id. The court interviewed the oldest three children, including the two oldest who were approximately twelve and eleven years old at the time of the hearing, and asked them many questions including whether they had anything else that they wished to say. Further, another witness indicated that the children wanted things to stay as they were. Therefore, we cannot conclude that the court failed to follow the statute.

6. Todd contends the court considered the findings and recommendation of the guardian ad litem without permitting an opportunity for her to respond or to cross-examine the witness. But the court indicated that it was going to get the guardian's input after the close of evidence, and Todd's attorney did not object. Therefore, any possible error has been waived. See generally *Spear v. State*, 270 Ga. 628, 632-633 (5) (513 SE2d 489) (1999).

*Judgment affirmed in part and reversed in part and case remanded. Ruffin and Barnes, JJ., concur.*

DECIDED JULY 3, 2002 —
RECONSIDERATION DENIED JULY 22, 2002.

*Deming, Parker, Hoffman, Green & Campbell, Richard A. Campbell, Elizabeth N. Harrison*, for appellant.
*Peevy & Lancaster, Donn M. Peevy*, for appellee.